BALDWIN v. EIDMAN.

(District Court, S. D. New York. January 3, 1913.)

1. INTERNAL REVENUE (§ 8*)—WAR REVENUE ACT—LEGACY TAX.

Liability to a legacy tax under War Revenue Act June 13, 1898, c. 448, § 29, 30 Stat. 464, as amended by Act March 2, 1901, c. 806, § 10, 31 Stat. 946 (U. S. Comp. St. 1901, p. 2307), is determined by the time when the legacy vests under the terms of the will, and is not affected by the fact that under the administration laws of the state the legacy did not become payable, so that its clear value could be ascertained for the purpose of assessment of the tax until after July 1, 1902, when the repeal of the act took effect.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 11, 12; Dec. Dig. § 8.*]

2. INTERNAL REVENUE (§ 8*)—WAR REVENUE ACT—LEGACY TAX—LEASEHOLDS —"LEGACY ARISING FROM PERSONAL PROPERTY."

A leasehold passing under a will is not subject to the legacy tax imposed by War Revenue Act June 13, 1898, c. 448, § 29, 30 Stat. 464, as

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

amended by Act March 2, 1901, c. 806, § 10. 31 Stat. 946 (U. S. Comp. St. 1901, p. 2307), as a "legacy * * * arising from personal property."

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 11, 12; Dec. Dig. § 8.*]

3. WORDS AND PHRASES—"DISTRIBUTIVE SHARES."

The expression "distributive shares" means the shares of personal property which are distributed in case of intestacy by virtue of statutes of distribution.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, pp. 2135, 2136.]

4. WORDS AND PHRASES—"LEGACY."

The expression "legacy" means a bequest of personal property.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, pp. 4054–4057; vol. 8, p. 7703.]

Action by Edwin Baldwin, as sole surviving executor and trustee under the will of John Daniell, deceased, against Elizabeth Eidman, administratrix of the estate of Ferdinand Eidman, deceased, late Collector of Internal Revenue. Judgment for plaintiff.

William H. Wadhams and Frederick S. Fisher, both of New York City, for plaintiff.

Henry A. Wise, U. S. Atty., and Addison S. Pratt, Asst. U. S. Atty., for defendant.

MAYER, District Judge. This action was brought by the executors and trustees of the will of John Daniell, deceased, against Ferdinand Eidman, collector of internal revenue for the Third collection district of New York, to recover $8,483.63 collected as taxes. The collector assumed to assess and collect the taxes in question, pursuant to sections 29 and 30 of the Spanish War Revenue Act of June 13, 1898 (Act June 13, 1898, c. 448, 30 Stat. 464, 465), as amended by the act approved March 2, 1901 (Act March 2, 1901, c. 806, §§ 10, 11, 31 Stat. 946, 948 [U. S. Comp. St. 1901, pp. 2307, 2308]). The taxes were paid by the executors under protest. The action has been duly continued by the sole surviving executor and trustee, against the administratrix of the estate of the deceased collector.

John Daniell died a resident of the county and state of New York on March 6, 1902, in possession, at the time of his death, of personal property of the actual value of $484,780.54. His will was probated on April 23, 1902, and on that date letters testamentary were issued to the executors. The executors, on January 19, 1903, filed with the collector of internal revenue a legacy return in due form and also filed a schedule of personal property of the estate of John. Daniell, deceased, showing the personal property in charge or trust of the executors.

Upon the last-named exhibit the executors indorsed a note calling attention to the fact that, in addition to the property enumerated in the schedule, there were in the estate certain unexpired Sailors' Snug Harbour leases, for 21 years, and renewals, being well-known estates for years in land lying in the city of New York, and also accrued rentals on leaseholds to subtenants, and further stating that these were not

valued or set forth in detail in the schedules, as they were interests arising from land and not from personal property, and therefore, as the executors claimed, not subject to this tax.

The collector, on May 12, 1903, made a schedule of legacies which included the leasehold property, thereby increasing the total value of the estate from $484,780.54 to $693,451.40. After deducting the debts and expenses, he assessed the tax against the estate at $7,783.15, which, together with the interest, amounted to $8,483.63, the sum which the executors were ultimately compelled to pay.

It is agreed for the purposes of this action that the clear value of the personal property left by John Daniell, after deducting debts and expenses of administration, was the sum of $431,659.18, and that the clear value of the leasehold estates was the sum of $208,670.86.

On June 12, 1903, the collector served on the executors a notice of the assessment, demanding payment.

On June 18, 1903, the executors filed a claim for abatement of the taxes.

Before payment was made there was considerable correspondence between the executors or their attorneys, and the collector and others representing the government, and finally, after repeated demands for the payment, and refusal to pay, the executors, on April 25, 1904, under protest as heretofore mentioned, paid to the collector the $7,783.15, together with interest, amounting to $700.48, making a total of $8,-483.63. Of the $7,783.15, the sum of $3,130.08 was assessed and collected on the value of the leasehold estates passing under the will of said John Daniell, deceased, as a part of his residuary estate, in equal parts, to two sons.

On April 28, 1904, the executors filed a claim for the refunding of $3,639.70 of said taxes, and on March 14, 1905, the executors made and filed a supplemental claim for the refunding of $8,483.63. Both of these claims were rejected by the Commissioner of Internal Revenue and, in due course, on October 4, 1905, this action was commenced to recover the aforesaid taxes.

The case having been submitted upon an agreed statement of facts, the questions presented are:

First. Whether upon such facts, as matter of law, the collector of internal revenue had jurisdiction and authority, pursuant to the Spanish War Revenue Act of June 13, 1898, as amended by the act approved March 2, 1901, to levy and collect from the executors of John Daniell, deceased, any sum. If not, it is contended by the plaintiff that he should return the $8,483.63 collected, with interest.

Second. Whether it was within the jurisdiction and authority of the collector to assess and collect, pursuant to the said act as amended, any tax upon the leasehold property, namely, the Sailors' Snug Harbour leaseholds, valued at $208,670.86. If not, it is the contention of the plaintiff that he is entitled to recover the sum of $3,130.08 assessed and collected on the value of said leasehold estates, with interest.

[1] First. The plaintiff contends that the collector of internal revenue had no jurisdiction or authority to collect any legacy tax because the period allowed for presentation and proving of claims against the

estate under the New York statutes had not elapsed and the net value of the estate had not been ascertained, nor had the legatees become absolutely vested in possession or enjoyment until after the passage of the Repealing Act of April 12, 1902 (Act April 12, 1902, c. 500, 32 Stat. 96 [U. S. Comp. St. Supp. 1911, p. 978]), and the Refunding and Declaratory Act of June 27, 1902 (Act June 27, 1902, c. 1160, 32 Stat. 406 [U. S. Comp. St. Supp. 1911, p. 983]), both of which took effect July 1, 1902.[1]

The laws of the state of New York during the years here under consideration (1902–1905, inclusive), provided for a period of one year of ordinary administration, and prohibited the payment of a legacy by an executor or administrator until after the expiration of the one-year period from the time of granting letters testamentary or letters of administration. New York Code of Civil Procedure, §§ 2721 and 1819.

There is no direction in the will to make payment prior to the expiration of one year from the time of granting letters.

[1] NOTE.—The provisions of the several acts of Congress to be considered in this action are as follows:

Extracts from War Revenue Act.

Sec. 29. "That any person or persons having in charge or trust, as administrators, executors, or trustees, any legacies or distributive shares arising from personal property, where the whole amount of such personal property as aforesaid shall exceed the sum of ten thousand dollars in actual value, passing, after the passage of this act, from any person possessed of such property, either by will or by the intestate laws of any state or territory, or any personal property or interest therein, transferred by deed, grant, bargain, sale, or gift, made or intended to take effect in possession or enjoyment after the death of the grantor or bargainer, to any person or persons, or to any body or bodies, politic or corporate, in trust or otherwise, shall be, and hereby are, made subject to a duty or tax, to be paid to the United States, as follows—that is to say: * * * the tax shall be * * * at the rate of * * * for each and every $100 of the clear value of such interest in such property. * * *" Act of June 13, 1898, 30 Stat. 448, as amended by Act of March 2, 1901, 31 Stat. 946.

Sec. 30. "That the tax or duty aforesaid shall be due and payable in one year after the death of the testator and shall be a lien and charge upon the property of every person who may die as aforesaid for twenty years, or until the same shall, within that period, be fully paid to and discharged by the United States; and every executor, administrator, or trustee having in charge or trust any legacy or distributive share, as aforesaid, shall give notice thereof, in writing, to the collector or deputy collector of the district where the deceased grantor or bargainer last resided within thirty days after he shall have taken charge of such trust, and every executor, administrator, or trustee, before payment and distribution to the legatees, or any parties entitled to beneficial interest therein, shall pay to the collector or deputy collector of the district of which the deceased person was a resident, or in which the property was located in case of nonresidents, the amount of the duty or tax assessed upon such legacy or distributive share, and shall also make and render to the said collector or deputy collector a schedule, list, or statement, in duplicate, of the amount of such legacy or distributive share, together with the amount of duty which has accrued, or shall accrue, thereon, verified by his oath or affirmation, to be administered and certified thereon by some magistrate or officer having lawful power to administer such oaths, in such form and manner as may be prescribed by the Commissioner of Internal Revenue, which schedule, list, or statement shall contain the

The "clear value" of the estate was therefore not determinable until April 23, 1903, one year after the date upon which letters testamentary were issued.

In the meantime, on July 1, 1902, the Refunding and Repealing Acts had gone into effect.

The view originally entertained by the Treasury Department was that a legacy tax was not payable until the legacy was payable (Treasury Decisions, No. 20,591 January 19, 1899, and No. 21,024 April 15, 1889) and this view had judicial support as late as 1909. Farrell v. United States (D. C.) 167 Fed. 639. But the Farrell Case is no longer authority since the decision in Hertz v. Woodman, 218 U. S. 205, 30 Sup. Ct. 621, 54 L. Ed. 1001.

An examination of the briefs in Hertz v. Woodman, supra, shows that the Farrell Case was cited and relied upon, and, indeed, the argument now presented was in substance the same as there presented.

The case at bar is not within the principle of Vanderbilt v. Eidman, 196 U. S. 480, 25 Sup. Ct. 331, 49 L. Ed. 563, where the legacy was

names of each and every person entitled to any beneficial interest therein, together with the clear value of such interest, the duplicate of which schedule, list, or statement shall be by him immediately delivered, and the tax thereon paid to such collector; and upon such payment and delivery of such schedule, list, or statement, said collector or deputy collector shall grant to such person paying such duty or tax a receipt or receipts for the same in duplicate, which shall be prepared as hereinafter provided." Act of June 13, 1898 (30 Stat. 448) as amended by the Act of March 2, 1901 (31 Stat. 946) and as re-enacted by the repealing Act of April 12, 1902 (32 Stat. 97).

Extract from Refunding and Declaratory Act.

Sec. 3. "That in all cases where an executor, administrator, or trustee shall have paid, or shall hereafter pay, any tax upon any legacy or distributive share of personal property under the provisions of the act approved June thirteenth, eighteen hundred and ninety-eight, entitled 'An act to provide ways and means to meet war expenditures, and for other purposes,' and amendments thereof, the Secretary of the Treasury be, and he is hereby, authorized and directed to refund, out of any money in the treasury not otherwise appropriated, upon proper application being made to the Commissioner of Internal Revenue, under such rules and regulations as may be prescribed, so much of said tax as may have been collected on contingent beneficial interests which shall not have become vested prior to July first, nineteen hundred and two. And no tax shall hereinafter be assessed or imposed under said Act approved June thirteenth, eighteen hundred and ninety-eight, upon or in respect of any contingent beneficial interest which shall not become absolutely vested in possession or enjoyment prior to said July first, nineteen hundred and two." Act of June 27, 1902, 32 Stat. 406.

Extracts from Repealing Act.

Sec. 7. "That section * * * twenty-nine of the act of June thirteenth, eighteen hundred and ninety-eight, and all amendments of said sections and schedules be, and the same are hereby, repealed."

Sec. 8. "That all taxes or duties imposed by section twenty-nine of the act of June thirteenth, eighteen hundred and ninety-eight, and amendments thereof, prior to the taking effect of this act, shall be subject, as to lien, charge, collection, and otherwise, to the provisions of section thirty of said act of June thirteenth, eighteen hundred and ninety-eight, and amendments thereof, which are hereby continued in force as follows: * * * * "

Sec. 11. "That this act, except as otherwise specially provided for in the preceding section, shall take effect July first, nineteen hundred and two." Act of April 12, 1902, 32 Stat. 97, 98, 99.

to be held in trust by the executors, and the legatee by the terms of the will was not to receive the principal until a later date, namely, after 1902. Here, however, the legacy vested immediately on the death of the testator. The prohibition of payment under the New York statute is simply in aid of the administration of the estate and the safeguarding of creditors. There is a marked difference between the right to demand payment of a legacy and the right to immediate possession or enjoyment under the War Revenue Act here considered. U. S. v. Fidelity Trust Co., 222 U. S. 158, 32 Sup. Ct. 59, 56 L. Ed. 137.

It is the right under the will which determines the legal status of the legacy, and, while the statutory proceedings to assess the tax may be postponed because of the operation of local statutes in respect of administration, such postponement is merely a matter of procedure and cannot change the legal effect of the testator's disposition. Any other construction would lead to hopeless confusion and destroy the uniform applicability of the act.

To illustrate: Suppose the payment of legacies was postponed by statute in three states for one, two, and three years, respectively, and three testators died on the same day leaving the same kind of legacies to the same class of legatees. We might then see the imposition of the tax in one case and not in the others—a result certainly never contemplated under a war revenue act where the intention was that all similarly situated were to be treated alike and subjected to the same burdens.

As was said in Knowlton v. Moore, 178 U. S. at page 77, 20 Sup. Ct. at page 761, 44 L. Ed. 969:

"We are therefore bound to give heed to the rule that where a particular construction of a statute will occasion great inconvenience or produce inequality and injustice, that view is to be avoided if another and more reasonable interpretation is present in the statute."

[2] Second. The second contention of the plaintiff is that the leasehold estates are not subject to the tax because they are not legacies arising from personal property. The history of the legislation, with particular reference to the act here under consideration, has been elaborately discussed in Knowlton v. Moore, 178 U. S. 41, 20 Sup. Ct. 747, 44 L. Ed. 969. After summarizing the origin, the development, and the theory underlying death duties, and reviewing the earlier statutes in this and other countries, and after a comparison of the act of 1898 with the act of 1864 (Act June 30, 1864, c. 173, 13 Stat. 223), the court says:

"That the provisions of the act of 1864 were in mind when the present act was drafted is apparent, since it is not disputed that the act under review, so far as the tax on legacies and distributive shares is concerned, is an exact reproduction of the original act of 1864, except to the extent that the present act contains provisions relating to a progressive increase of rates." 178 U. S. at page 69, 20 Sup. Ct. at page 759, 44 L. Ed. 969.

And again:

"The subject taxed, therefore, under the present act, is the same which was taxed under the act of 1864." 178 U. S. at page 71, 20 Sup. Ct. at page 759, 44 L. Ed. 969.

The act of 1864 was in two divisions: One, taxing real estate which was defined by the act; and, the other, taxing legacies and distributive shares arising out of personal property.

When the Congress passed the act of 1898, it was deemed sufficient for the purposes of the war revenue to take only one of these classes, and, modeling the act upon the act of 1864, it took only that part of the act of 1864 (almost verbatim) which dealt with the properties not included in those defined by the law of 1864 as real estate. The court, in Knowlton v. Moore, supra, points out that the act of 1864 was based upon the English Succession Duty Act.

"The act of 1864, however, added, in separate sections, a duty on the passing of real estate, in substantial harmony with the principle of the succession tax expressed in the English Succession Duty Act. Thus it came to pass that the system of death duties prevailing in England and that adopted by Congress—leaving out of view the differences in rates and the administrative provisions—were substantially identical, and of a threefold nature; that is, a probate duty charged upon the whole estate, a legacy duty charged upon each legacy or distributive share of personalty, and a succession duty charged against each interest in real property." 178 U. S. at page 51, 20 Sup. Ct. at page 747, 44 L. Ed. 969.

"Whilst the general plan of the act of 1864 shows that its framers had in mind the English law, this fact was conclusively demonstrated by section 127, wherein the succession or real estate inheritance tax was defined in substantially similar terms to that contained in the English Succession Duty Act. The identity of the conception embodied in the act of 1864 with that existing in England was observed by this court in Scholey v. Rew, 23 Wall. 331 [23 L. Ed. 99]. * * *" 178 U. S. at page 52, 20 Sup. Ct. at page 752, 44 L. Ed. 969.

As the act of 1898 took only one of these divisions, viz., legacies and distributive shares arising out of personal property, it is desirable to examine the act of 1864 and the English act with a view of ascertaining whether leasehold property is in the division relating to real estate or in that relating to legacies or distributive shares arising out of personal property. The English Succession Act (16 and 17 Victoria), chapter 51, provided:

"1. In the construction and for the purposes of this act: The term 'real property' shall include all freehold, copyhold, customary, leasehold and other hereditaments, and heritable property, whether corporeal or incorporeal, in Great Britain and Ireland, except money secured on heritable property in Scotland and all estates in any such hereditaments; the term 'personal property' *shall not include leaseholds*, but shall include money payable under any engagement and money secured on heritable property in Scotland, and all other property not comprised in the preceding definition of real property."

The act of 1864 (chapter 173, 13 Stat. 223) under the heading, "Succession to Real Estate," provided:

"Sec. 126. And it be further enacted, that for the purposes of this act, the term 'real estate' shall include all lands, tenements, and hereditaments, corporeal and incorporeal; that the term 'succession' shall denote the devolution of title to any real estate."

It will be noted that the English act included leaseholds within the term "real property" and used the expression "other" hereditaments. Manifestly, ejusdem generis, for the purposes of taxation, leaseholds were considered as hereditaments.

An examination of the English act in detail will show a logical and comprehensive scheme under which real property and interests arising therefrom or investments therein were clearly distinguished from personal property or interests arising therefrom or investments therein. Section 19 (16 & 17 Victoria, p. 259) provided:

"XIX. No legatee or other person shall, after the time appointed for the commencement of this act, be chargeable under the Legacy Duty Acts with duty, not then already due, in respect of any leasehold hereditaments of any testator or deceased person, as belonging to the personal estate of the testator or deceased."

See, also, sections 28, 29, and 30. Section 29 treats, as personalty, the proceeds of a sale of real property under "any trust for the sale thereof"; such proceeds being in the nature of a legacy, while section 21 treats as real property these cases where personal property is to be invested in real property.

Copyhold and customary are not known in this country. Washburn on Real Property (6th Ed.) § 82. In England, while copyholds are not freeholds, they are now included, as Williams says, "in what is called real property." Williams on Real Property (20th Ed.) at page 451. See page 439 et seq. Customary freeholds likewise seem to be regarded as real property. Williams, supra, page 454 et seq.

When, therefore, the framers of the act of 1864 were drafting that act with the English act before them, it is unlikely that they intended to introduce distinctions as to classification different from those so carefully worked out in the English act.

The English act having included leaseholds, copyholds, and customary freeholds as hereditaments or, in any event, as real property (by whatever technical name called), it was sufficient for the act of 1864 to define "real estate" as including "lands, tenements and hereditaments."

The words "copyhold" and "customary" and "heritable property in Scotland" were not applicable in this country, and obviously it was thought that "hereditaments" would cover all ownership or interests in land not comprehended within the words "lands" and "tenements."

Just as the English Parliament evidently was not considering the various interests arising out of real estate from their technical legal standpoint in other relations, but was considering what kinds of property should be taxed and in what manner, so the Congress, confronted with the necessity of raising large revenues, had in mind the separation of property into two broad divisions, namely, real estate and personal property.

The existence of special statutory or code provisions in this or any other state, defining leaseholds for special purposes, did not affect the character of such leaseholds for taxation under the act of 1864.

In one state a leasehold might have been regarded as personal property for purposes of distribution to the next of kin, while in another state it might have been regarded as real property for descent to heirs. With a diversity of treatment, in various parts of the country, of leaseholds as real or personal property, it is manifest that the Congress was not regarding the local laws in that respect.

When the Spanish War Revenue Act was passed, there were several states in which leaseholds were defined within the rules applicable to real property.

Thus, by section 3109 of the Civil Code of Georgia, 1895, it is provided:

"An estate for years is one which is limited in its duration to a period fixed, or which may be made fixed and certain. If it be in lands, it passes as realty in this state. It may be for any number of years, so that the limitation be within the rule against perpetuities."

By chapter 129, § 1, of the Laws of Massachusetts (vol. 2 of the Revised Laws of Massachusetts of 1902, p. 1258), it is provided:

"If land is demised for the term of one hundred years or more, the term shall, so long as fifty years thereof remain unexpired be regarded as an estate in fee simple as to everything concerning the descent and devise thereof upon the decease of the owner, the right of dower or of curtesy therein, the sale thereof by executors, administrators, guardians or trustees, the levy of execution thereon; and the redemption thereof if mortgaged or taken on execution; and whoever holds as lessee or assignee under such a lease shall, so long as fifty years of the term remain unexpired, be regarded as a freeholder for all purposes."

In Cincinnati College v. Yeatman, 30 Ohio St. 276, at page 285, it is said:

"At common law, an estate for years, renewable forever was a chattel; but by our statutes and by the decisions of our courts they are treated as real estate."

By section 8597 of the General Ohio Code it is provided that permanent leasehold estates, renewable forever, shall be subject to the same law of descent as estates in fee are subject to by the provisions of this chapter.

Without pursuing the inquiry further, it will thus be seen that, in at least some of the states, estates for years are not personal property.

But the government insists that the definition of leaseholds at common law, as chattels real, must be regarded as a controlling definition. As was said in Wheaton v. Peters, 8 Pet. 591, at page 658 [8 L. Ed. 1055]:

"It is clear there can be no common law of the United States. The federal government is composed of 24 sovereign and independent states, each of which may have its local usages, customs, and common law. There is no principle which pervades the Union and has the authority of law, that is not embodied in the Constitution or laws of the Union. The common law could be made a part of our federal system, only by legislative adoption."

It is true, of course, that certain rights and privileges secured by the federal Constitution are identical with those secured by the common law of England, and that they are secured to the citizens of the United States in language identical, in some instances, with that by which they were secured to the people of England by Magna Charta and the Bill of Rights; and it is natural that the United States courts, in construing these provisions, should follow the common law of England. Except, however, in such similar cases and the cases where the courts adopt propositions of the English common law because they express our ideas, the common law of England is not binding upon

the United States courts, and will be looked to only as an aid to construction.

It is useful here only as enabling us to determine whether Congress regarded personal property as including leaseholds because at common law leaseholds were so regarded. If, by reason of the history of the statute, its phraseology, and in the light of surrounding circumstances, a more likely construction must be placed upon "leaseholds," then the definition at common law is no more than any other definition, and this observation applies equally to the holdings of the New York courts upon the question as to whether leaseholds are real or personal property in various connections and as related to various rights.

When the Congress was framing the Spanish War Revenue Act, it concluded that it was unnecessary to tax real property, and therefore such part of the act of 1864 as related to real estate was bodily left out of the Spanish War Revenue Act. The act of 1898, as to personal property, was, as it were, a lineal descendant of the act of 1864 and the English Succession Act.

Further, there is in the statute an expression which indicates the intention of Congress to confine taxable legacies or distributive shares to those which arise from personal property—otherwise the words "arising from personal property" are meaningless.

[3] The expression "distributive shares" has always been regarded as meaning the shares of personal property which are distributed in a case of intestacy by virtue of statutes commonly called statutes of distribution. The New York statute of distributions, for instance, "is taken from the English statute of 22 and 23 Charles II, c. 10, which was borrowed from the 118th Novel of Justinian, and, except in some few instances mentioned in the statute, is governed and construed by the rules of the civil law, and not, as is the statute of descents, by the common law. The share which comes to a person under this statute is designated a distributive share." Redfield's Law & Practice of Surrogates' Courts (6th Ed.) § 216.

[4] The expression "legacy" means a bequest of personal property. Orton v. Orton, *42 N. Y. 486.

Therefore, had the statute eliminated the expression "arising from personal property," it might possibly have been argued that the common-law definition of leasehold must be accepted, and that, a leasehold being a chattel real at common law, it passed to the personal representatives and *not* to the heirs (2 Blackstone's Commentaries, c. 9, p. 142; 2 Kent's Commentaries, pt. 5, lecture 35, p. 342) and, therefore, whether by way of legacy or distributive share, was taxable because personal property.

But when the Congress added the words "arising out of personal property" it clearly meant that the source of the legacy or share must be personal property and not real estate, and that interests arising out of real estate should be treated on a different basis in the act of 1864 from those arising out of personalty and should be excluded from the act of 1898 because not needed for revenue purposes.

There is another consideration which I think has an element of persuasion. The act of 1898 provides an elaborate scheme of taxation.

202 F.—62

in respect of which the mathematical computations are simple and automatic. Thus, under what was called "special taxes," persons in various occupations paid a specific sum. For instance, brokers were required to pay $50; bankers, $50 or more, dependent upon amount of capital employed; proprietors of billiard rooms, $5 for each table. Under the heading "tobacco, cigars, cigarettes and snuff," a tax of so many cents per pound, etc., was levied. Tobacco dealers and manufacturers were taxed on a plan whereby the computation, upon a truthful return, would be automatic. What were called "stamp taxes" likewise required only automatic calculation—similarly, medicinal and other articles and preparations and the tax on persons and corporations engaged in refining petroleum and sugar. There is no reason why any different principle should be applicable to legacies and distributive shares of personal property referred to in sections 29 and 30. The act expected that administrators, executors, or trustees would properly administer their duties, and that, in the administration of estates in various localities throughout the country, the probate courts would determine how much was to be distributed, either by way of legacy or distributive share. Assuming that to be done which the law presumes will be done, there was nothing for the collecting officers of the government to do except to make their ministerial mathematical calculation in accordance with the percentages of the statute. It was never contemplated that any tax laid under this act should be based upon a valuation made by the collecting officer unless the persons whose duty it was to furnish the appropriate reports to the government failed in that duty.

In other words, the scheme of taxation in 1898 was not to include property concerning the value of which there might be an honest and great variance of opinion such as the value of a leasehold, but to have a simple source of taxation in respect of which the tax could be readily and accurately computed.

The difference in the duties of the collectors in regard to personal and real property well demonstrates this proposition.

Under section 30 of the act of 1898 and section 125 of the act of 1864, the collecting officer need only check up the return and, by simple arithmetic, find if the figures are right.

Under section 147 of the act of 1864, the collecting officer has the authority of appraisal of real estate and may place his own valuation on real estate, "but it shall be lawful for the assessor or assistant assessor, if dissatisfied with such account, * * * to assess the duty on the best information he can obtain. * * *"

Certainly there is no species of property in regard to which there may be a greater diversity in estimate of value than a leasehold, where one must consider location, character, or change of neighborhood, expiration of term, and other elements.

It seems to me, therefore, that whether the act of 1898 be regarded as having been fundamentally modeled on the English Succession Act, or whether the words "arising from personal property" be regarded as a strict limitation as herein pointed out, or whether the act of 1898 by its whole scheme and construction would necessarily exclude lease-

holds, the conclusion must be the same; and, in any event, where the doubt is substantial as in this case, it must be resolved, in favor of him upon whom it is sought to impose the tax, and the statute must be strictly construed against the United States. Eidman v. Martinez, 184 U. S. 578, 583, 22 Sup. Ct. 515, 46 L. Ed. 697.

For the reasons stated, the plaintiff is entitled to judgment for the sum of $3,130.08, with interest.